UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

ROGER MACAULEY, as the Personal         Case No.
Representative of the Estate of Timothy
Paul Kusma, Deceased,

     Plaintiff,

v.

COLLIER COUNTY SHERIFF'S OFFICE
and KEVIN RAMBOSK, in his official
capacity as the Sheriff of Collier County,
Florida.

     Defendants.

_____/

## COMPLAINT FOR DAMAGES

The Plaintiff, ROGER MACAULEY, as the Personal Representative of the Estate of Timothy Paul Kusma, Deceased, sues Defendants, COLLIER COUNTY SHERIFF'S OFFICE and KEVIN RAMBOSK, in his official capacity as the Sheriff of Collier County, Florida, and alleges:

### JURISDICTIONAL STATEMENT AND IDENTIFICATION OF PARTIES

1.     This is an action for damages in excess of this Court's minimum jurisdictional limits, exclusive of interest and costs.

2.     The predominate counts in this action arise under the Constitution and law of the United States of America and thus invoke this Court's original

jurisdiction over federal questions pursuant to 28 U.S.C. § 1331, 28 U.S.C § 1343, 42 U.S.C § 1983, and 42 U.S.C. § 1988.

3. The remaining counts in this action arise under the common law of the State of Florida and are so related to those claims for which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution and thus invoke this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1332.

4. Venue is proper in the Fort Myer's Division for the Middle District of Florida, where one or more of the Defendants reside and the events giving rise to this action occurred.

5. The Plaintiff has fully complied with all conditions precedent prior to bringing this action, including, but not limited to, Section 768.28.

6. At all times relevant to this case, the Plaintiff, ROGER MACAULEY was and is a resident of Collier County, Florida. He is the natural father of Timothy Paul Kusma. ROGER MACAULEY has been appointed as the Personal Representative of the Estate of Timothy Paul Kusma. *See* Letters of Administration, attached hereto as **Exhibit "A"**.

2

7.     Yulisa Elizabeth Sanchez Carrillo is the wife and surviving spouse of Timothy Paul Kusma.

8.     Defendant, COLLIER COUNTY SHERIFF'S OFFICE, is the public sheriff's department for Collier County, Florida. It operated as a public entity to enforce the laws of the State of Florida in Collier County, Florida, as well as operates the Naples Jail Center.

9.     Defendant, KEVIN RAMBOSK, was and is the Sheriff of Collier County, Florida. At all times relevant hereto, KEVIN RAMBOSK was acting as an agent of the State of Florida and under the color of State law.

10.     At all times give rise to this cause of action, the COLLIER COUNTY SHERIFF'S OFFICE was led by KEVIN RAMBOSK – the Sheriff of Collier County, Florida.

11.     At all times relevant hereto, the COLLIER COUNTY SHERIFF'S OFFICE was an agency of the State of Florida and official actions taken by the COLLIER COUNTY SHERIFF'S OFFICE, by and through its employees and officers, were done so under the color of State law.

HALBERG & FOGG, PLLC, ATTORNEYS AT LAW
BARRISTERS BUILDING, SUITE 3B, 1615 FORUM PLACE, WEST PALM BEACH, FL 33401 ● TEL. (561) 616-3000

12.     The Naples Jail Center is a correctional facility intended to *inter alia* detain people who are accused of violating the criminal laws of the State of Florida within the jurisdiction of Collier County, Florida.

13.     ARMOR CORRECTIONAL HEALTH SERVICES, INC. (hereinafter referred to as ARMOR), is and was a Florida For-Profit Corporation providing correctional facility medical and nursing care and treatment in Collier County, Florida, specifically at the Naples Jail Center located at 3347 Tamiami Trail East, Naples, Florida.

14.     ARMOR CORRECTIONAL HEALTH SERVICES, INC. is and was an independent contractor hired by COLLIER COUNTY SHERIFF'S OFFICE to provide medical care to inmates at the Naples Jail Center. Specifically, ARMOR CORRECTIONAL HEALTH SERVICES, INC. had sole decision-making authority over the medical care provided to inmates at the Naples Jail Center and its employees and medical staff acted independently from the COLLIER COUNTY SHERIFF'S OFFICE.

15.     ARMOR is a corporation doing business in the State of Florida, and Collier County in particular, which employs doctors and other medical providers (Registered Nurses, Licensed Practical Nurses, Advanced Registered Nurse

Practitioners) who provide medical care and treatment to people incarcerated in jails throughout the State Florida and the United States.

## FACTS GIVING RISE TO CAUSE OF ACTION

### *INMATE HEALTH CARE SERVICES AGREEMENT*

16.     The Naples Jail Center is operated by the COLLIER COUNTY SHERIFF'S OFFICE.

17.     On September 25, 2015, KEVIN RAMBOSK, acting in his official capacity as the Sheriff of Collier County, Florida, entered into a contract with ARMOR wherein the COLLIER COUNTY SHERIFF'S OFFICE retained ARMOR to provide Inmate Healthcare Services at the Naples Jail Center. ("The Agreement); *See* 2015 Inmate Healthcare Services Agreement, attached hereto as **Exhibit "B"**. The Agreement was to commence on October 1, 2015.

18.     ARMOR is and was an independent contractor hired by the COLLIER COUNTY SHERIFF'S OFFICE to provide medical care to inmates at the Naples Jail Center.

19.     The Agreement acknowledges COLLIER COUNTY SHERIFF'S OFFICE'S and ARMOR'S respective statutory and constitutional duties and

5

responsibilities to provide for delivery of reasonable, necessary and legally required medical care to inmates. *See* **Exhibit "B"**, Section 1, ¶ 1.

20.     The Agreement further acknowledges that in the accomplishment of its obligations under the contract that ARMOR would "comply with all applicable federal, state, local laws, statutes, acts, rules, regulations, and orders as they related to the care and treatment of inmates." *See* **Exhibit "B"**, Section 1, ¶ 2.

21.     The Agreement specifically states that the COLLIER COUNTY SHERIFF'S OFFICE "determined that [ARMOR'S] proposal was the most advantageous to [the COLLIER COUNTY SHERIFF'S OFFICE] after review and consideration of the evaluation criteria set forth in the solicitation" by ARMOR.

22.     The scope of the Agreement provided that ARMOR was to provide 24-hour (24/7/365) comprehensive healthcare services program for the COLLIER COUNTY SHERIFF'S OFFICE two jail centers located in Naples and Immokalee, Florida. The professional services included medical, mental health, dental and related care and administrative services for the inmates as required by law.

23.     ARMOR agreed to provide medical, mental health, dental, technical and support staffing 24/7/365 for inmate healthcare services at the facilities that guarantees timely care.

6

24.   The Agreement had a term of three (3) years, continuing in full force and effect through September 30, 2018.

25.   Under the terms of the Agreement, the COLLIER COUNTY SHERIFF'S OFFICE would compensate ARMOR $4,883,121.00 as base compensation with a maximum annual aggregate cap of $750,000.00 for off-site medical services. However, all associated costs of inmate off-site treatment for inpatient and outpatient services was to be ARMOR's responsibility.

26.   As such, there was a built-in financial incentive on the part of ARMOR to not seek off-site inpatient and/or outpatient services for inmates, and the Defendants knew or should have known about this financial incentive for ARMOR to limit off-site inpatient and/or outpatient services for inmates.

27.   Under the terms of the Agreement, ARMOR was required to establish an on-going Quality Assurance Program consisting of regularly scheduled audits of healthcare services with documentations on deficiencies and plans for correction of deficiencies. That program was to include, but not be limited to, a provision for program monitoring (peer review) by an outside third party, "outside consultant" on an annual basis; the results of which were to be made available to the Jail Administrator. *See* **Exhibit "A",** ¶ 24.

## *PAST ARMOR INCIDENTS*

28.    Based on information and belief, prior to the incident giving rise to this lawsuit, on or about February 11, 2011, William Campbell died of sepsis and medical negligence in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable. Information regarding the death of William Campbell and ARMOR's actions was in the public domain.

29.    Based on information and belief, on or about October 10, 2011, prior to the incident giving rise to this lawsuit, Gary Joseph Smith died of pneumonia medical negligence in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable. Information regarding the death of Gary Joseph Smith and ARMOR's actions was in the public domain.

30.    Based on information and belief, prior to the incident giving rise to this lawsuit, William Herring died due to medical negligence in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable. Information regarding the death of William Herring and ARMOR's actions was in the public domain.

8

31.     Based on information and belief, prior to the incident giving rise to this lawsuit, on or about August 23, 2017, Darryl Vaugh Hanna, Jr. was permanently injured due to medical negligence in the Manatee County Jail in Florida, a facility at which ARMOR then provided health services, and that injury was preventable. Information regarding the injury of Darryl Vaugh Hanna, Jr. and ARMOR's actions was in the public domain.

32.     Based on information and belief, prior to the incident giving rise to this lawsuit, Charles Jones died due to medical negligence in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable. Information regarding the death of Charles Jones and ARMOR's actions was in the public domain.

33.     Based on information and belief, prior to the incident giving rise to this lawsuit, Lina Odom died due to medical negligence in the Duval County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable. Information regarding the death of Lina Odom and ARMOR's actions was in the public domain.

34.     Based on information and belief, prior to the incident giving rise to this lawsuit, Nathan Bradshaw died due to medical negligence in the Broward

County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable. Information regarding the death of Nathan Bradshaw and ARMOR's actions was in the public domain.

35.    Based on information and belief, prior to the incident giving rise to this lawsuit, April Brogan died due to medical negligence in the Volusia County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable. Information regarding the death of April Brogan and ARMOR's actions was in the public domain.

36.    Based on information and belief, prior to the incident giving rise to this lawsuit, Raleigh Priester died due to medical negligence in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable. Information regarding the death of Raleigh Priester and ARMOR's actions was in the public domain.

37.    Based on information and belief, prior to the incident giving rise to this lawsuit, Kristina Ann Fienbrink died due to medical negligence in Wisconsin at facility at which ARMOR then provided health services, and that injury was preventable. Information regarding the death of Kristina Ann Fienbrink and ARMOR's actions was in the public domain.

38.     Based on information and belief, prior to the incident giving rise to this lawsuit, ARMOR was barred from soliciting bids to provide inmate healthcare services in New York for failing to provide required health services to inmates in that State. This information was within the public domain. https://www.courthousenews.com/prison-medical-firm-booted-from-ny-jail/

39.     Based on information and belief, prior to the incident giving rise to this lawsuit, ARMOR was sued by the State of New York over the deaths of multiple inmates under ARMOR's care and treatment. This information was within the public domain. *See The People of the State of New York v. Armor Correctional Health Medical Services of New York, Inc., P.C. et. al.*, Index No. 450835/2016, New York County, New York, Supreme Court. That verified petition alleged, inter alia, that between 2011 and July 2016, a total of fourteen (14) deaths occurred at the Nassau and Niagara counties jailed serviced by ARMOR, and the New York State Commission of Correction's Medical Review Board, which was charged with the oversight of the jail and prison health care and the investigation of related morbidity and mortality incidents, "found egregious lapses in medical care in seven of the 14 deaths." It further alleged that the New York Attorney General's own investigation revealed that ARMOR had not met it contractual

11

obligations to Nassau County, New York, had inadequate self-assessments or self-audits, inadequate continuous quality improvement processes, inadequate diagnostic services, inadequate referrals to specialists, inadequate staffing, and failure to maintain its equipment and accurate complete medical records. The Complaint in that case alleges that: records relating to each of these deaths demonstrate an array of deeply problematic practices, including ARMOR's failure to provide timely medical care in response inmate needs, provide adequate medical and psychiatric evaluations; perform diagnostic tests and timely dispense needed prescription drugs, refer inmates to specialists care where medical necessary, and carry out orders set forth by clinicians.

40.    Based on information and belief, prior to the incident giving rise to this lawsuit, ARMOR has been criminally charged for falsifying medical records in the death of a man in Wisconsin. Specifically, nurses employed by ARMOR demonstrated a pattern of intentionally falsifying health care records within the course and scope of their employment, and ARMOR was subsequently criminally charged. See, e.g. *State of Wisconsin v. Armor Correctional Health Services, Inc.*, 2018-ML-4041, Milwaukee County, Wisconsin, Circuit Court. This information was withing the public domain.

12

41.    Based on information and belief, prior to the incident giving rise to this lawsuit, ARMOR contracts to provide inmate healthcare services have been cancelled, terminated, and/or not renewed by jail centers, Sheriff Offices, and Counties across the United States for poor performance.

42.    Based on information and belief, prior to the incident giving rise to this lawsuit, the Sheriff of Sarasota County, Florida was sued for giving ARMOR a 'no-bid' contract and the lawsuit includes allegations that ARMOR provided gifts to Sheriff Bill Balkwill in the time period leading up to the 'no-bid' contract award.

43.    Based on information and belief, prior to the incident giving rise to this lawsuit, ARMOR routinely sought to prevent transferring patients to hospitals for medical emergencies, needs, and admissions, as well as, prevented outpatient procedures as a means to save money. ARMOR systematically attempted to prevent the transfer of patients in need of a higher level of medical care to outside facilities as a means to save money. ARMOR routinely placed profits over the health and safety of its patients/inmates.

44.    Based on information and belief, prior to the incident giving rise to this lawsuit, multiple other incidents across the United States established that

HALBERG & FOGG, PLLC, ATTORNEYS AT LAW
BARRISTERS BUILDING, SUITE 3B, 1615 FORUM PLACE, WEST PALM BEACH, FL 33401 ● TEL. (561) 616-3000

ARMOR had a pattern and/or practice of providing negligent, insufficient, grossly negligence, and/or substandard medical care and treatment to inmates. These incidents occurred prior to the death of Timothy Paul Kusma and details regarding these incidents were within the public domain.

45.     Based on information and belief, prior to the detention of Timothy Paul Kusma, ARMOR had a longstanding and widespread practice throughout the United States of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals; or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

46.     In 2016, Timothy Paul Kusma suffered a diabetic seizure while at the Naples Jail Center under the care and treatment of ARMOR. That diabetic seizure was preventable and was a result of ARMOR medical staff not properly provided medical care and treatment to Timothy Paul Kusma.

### *MEDICAL CARE AND TREATMENT OF TIMOTHY PAUL KUSMA*

47.    On or about March 28, 2019, Timothy Paul Kusma was arrested by agents of the COLLIER COUNTY SHERIFF'S OFFICE on suspicion of operating a motor vehicle with a suspended driver's license.

48.    On March 28, 2019, following an arrest for suspicion of operating a motor vehicle with a suspended driver's license, Timothy Paul Kusma was booked into the Naples Jail Center. Timothy Paul Kusma was subsequently denied bond by a Circuit Court Judge, and he remained in jail as a result of a probation violation from an earlier criminal infraction.

49.    At the time of his arrest, Timothy Paul Kusma was a thirty-one (31) year-old male who was a Type 1 diabetic since childhood.

50.    Mr. Kusma's home diabetes medication was Lantus 150 units per day and Novolog 200 units per day.  Mr. Kusma's Type 1 diabetes and was well maintained at the time of his arrest and incarceration at the Collier County jail.

51.    At the time of his first glucose check in the Naples Jail Center on March 28, 2019, Mr. Kusma's blood glucose level was 116 – a normal level for someone with Mr. Kusma's condition. Furthermore, Mr. Kusma was documented as being in good condition and not suffering from any major acute medical issues or conditions as of March 28, 2019.

15

52.     At all times relevant to this case, the COLLIER COUNTY SHERIFF'S OFFICE outsourced its jail medical services to ARMOR.

53.     ARMOR is a private corporation that provides medical care across the county to people who are incarcerated.

54.     ARMOR and its medical staff and employees had sole decision-making authority over the medical care provided to inmates at the Naples Jail Center, including Timothy Paul Kusma, and its employees and medical staff acted independently from the COLLIER COUNTY SHERIFF'S OFFICE.

55.     While Mr. Kusma's blood glucose levels were normal at the time he was booked into the Collier County jail, because he was not provided with his normal long acting insulin by ARMOR medical staff and employees, Mr. Kusma's blood sugar level began to skyrocket.

56.     Mr. Kusma repeatedly informed the employees and medical staff of ARMOR that his blood glucose levels were too high and that he needed medical attention. However, the employees and medical staff of ARMOR either failed to act or acted in a manner that was medically insufficient and contrary to ARMOR's own internal policy and procedure regarding assessing and managing a diabetic patient.

57.     Starting on March 29, 2019, and continuing for multiple days, Mr. Kusma complained to the medical staff and employees of Armor that his blood sugar levels were too high and that the insulin that was being provided to him was insufficient to bring his blood sugar levels to a normal range.

58.     On April 1, 2019, Mr. Kusma became ill and proceeded to vomit. He informed the medical staff of Armor that his blood glucose levels were too high and that he needed the proper medication that he took at home. However, his appropriate medication was not provided to him by the medical staff of ARMOR.

59.     On April 2, 2019, because of Mr. Kusma's medical condition, complaints and the rise in his blood glucose levels, he was placed in the medical observation unit of the Naples Jail Center.

60.     On April 3, 2019, the medical staff of ARMOR noted that Mr. Kusma's blood pressure was elevated and even after providing Mr. Kusma with medication, his blood pressure was still elevated at 154/88. Again, Mr. Kusma complained that his blood glucose levels were elevated. Mr. Kusma was not transported to an emergency room for a higher level of medical care even though it was medically warranted.

HALBERG & FOGG, PLLC, ATTORNEYS AT LAW
BARRISTERS BUILDING, SUITE 3B, 1615 FORUM PLACE, WEST PALM BEACH, FL 33401 ● TEL. (561) 616-3000

61.     On April 6, 2019, Mr. Kusma was still complaining of feeling ill and now was profusely sweating in his jail cell. Again, he informed the medical staff of ARMOR that his blood glucose levels were too high, but the appropriate medication was not provided to him by the medical staff of ARMOR. Mr. Kusma informed the medical staff of ARMOR that he felt shaky and dizzy. He stated "I guarantee my sugar is still high. I feel weak and terrible". Again, Mr. Kusma's blood pressure and heartrate were elevated. Mr. Kusma was not transported to an emergency room for a higher level of medical care even though it was medically warranted.

62.     On April 7, 2019, Mr. Kusma exhibited confusion by stating that his blood glucose level was low even though it was highly elevated. Mr. Kusma was not transported to an emergency room for a higher level of medical care even though it was medically warranted.

63.     On April 8, 2019, Mr. Kusma complained to the medical staff of ARMOR that his "heart was hurting" and that his blood glucose levels were too high. Again, the appropriate medication was not provided to him by the medical staff of ARMOR. Mr. Kusma was not transported to an emergency room for a higher level of medical care even though it was medically warranted.

HALBERG & FOGG, PLLC, ATTORNEYS AT LAW
BARRISTERS BUILDING, SUITE 3B, 1615 FORUM PLACE, WEST PALM BEACH, FL 33401 ● TEL. (561) 616-3000

64.     On April 9, 2019, Mr. Kusma complained to the medical staff of Armor that he was coughing up blood and that his blood glucose level was too high.  Mr. Kusma also complained of severe diarrhea, nausea, pain, and thirst. Again, the appropriate medication was not provided to him by the medical staff of Armor, nor was Mr. Kusma transported to a hospital for more acute medical attention. Mr. Kusma was not transported to an emergency room for a higher level of medical care even though it was medically warranted.

65.     On April 10, 2019, Mr. Kusma reported to the medical staff of ARMOR that he lost consciousness. Mr. Kusma was not transported to an emergency room for a higher level of medical care even though it was medically warranted.

66.     On April 11, 2019, after returning from a court hearing Mr. Kusma was clearly very ill (as reported by the deputies transporting him to court to Dr. Kazvinova that he defecated on himself). Because he recently defecated on himself, Mr. Kusma was placed in a shower after receiving no medical attention. While in the shower, Mr. Kusma collapsed.

67.     Mr. Kusma was unresponsive and chest compressions commenced immediately while other staff arrived at the scene. Epinephrine was administered to Mr. Kusma with no effectiveness in reviving his life.

68.     Nevertheless, Mr. Kusma was then taken by ambulance to North Collier Hospital unresponsive. Mr. Kusma's blood glucose level was 430 on his way to the emergency room. Laboratory studies were done of Mr. Kusma's blood which showed that he was in a state of severe diabetic ketoacidosis – his lactic acid was extremely elevated at 17.9 mmol/L.

69.     Throughout his time at the Naples Jail Center, ARMOR medical staff failed to take appropriate and reasonable actions to respond to the highly elevated blood glucose levels of Mr. Kusma. The following is a chart of Mr. Kusma's elevation in his blood glucose levels while under the care and treatment of Armor employees.

| | | | |
|---|---|---|---|
| 3/28/19 Glucose – 116 | 4/01/19 Glucose – 291 | 4/04/19 Glucose – 473 | 4/07/19 Glucose – 245 |
| 3/29/19 Glucose – 138 | 4/01/19 Glucose – 296 | 4/04/19 Glucose – 411 | 4/08/19 Glucose – 315 |
| 3/29/19 Glucose – 202 | 4/01/19 Glucose – 323 | 4/05/19 Glucose – 363 | 4/09/19 Glucose – 350 |
| 3/29/19 Glucose – 270 | 4/02/19 Glucose – 269 | 4/05/19 Glucose – 323 | 4/10/19 Glucose – 366 |
| 3/30/19 Glucose – 246 | 4/02/19 Glucose – 251 | 4/05/19 Glucose – 296 | 4/10/19 Glucose – 289 |
| 3/30/19 Glucose – 279 | 4/02/19 Glucose – 266 | 4/05/19 Glucose – 292 | 4/10/19 Glucose – 325 |
| 3/30/19 Glucose – 255 | 4/02/19 Glucose – 320 | 4/06/19 Glucose – 386 | 4/10/19 Glucose – 373 |
| 3/30/19 Glucose – 348 | 4/02/19 Glucose – 382 | 4/06/19 Glucose – 384 | 4/10/19 Glucose – 599 |
| 3/31/19 Glucose – 227 | 4/02/19 Glucose – 396 | 4/06/19 Glucose –265 | 4/11/19 Glucose – 432 |
| 3/31/19 Glucose – 273 | 4/03/19 Glucose – 433 | 4/06/19 Glucose – 268 | 4/11/19 Glucose – 312 |
| 3/31/19 Glucose – 302 | 4/03/19 Glucose – 383 | 4/07/19 Glucose – 289 | 4/11/19 Glucose – 410 |

| 3/31/19 Glucose – 327 | 4/04/19 Glucose – 362 | 4/07/19 Glucose – 294 | 4/11/19 Glucose – 500 |
|---|---|---|---|
| 3/31/19 Glucose – 317 | 4/04/19 Glucose – 393 | 4/07/19 Glucose – 252 | 4/11/19 Glucose – 450 |

70.     Timothy Kusma was declared dead shortly after arriving at North Collier Hospital as a result of his untreated medical conditions.

71.     Mr. Kusma informed the medical staff of ARMOR multiple times that his at-home insulin medication was different than the one being provided to him at the Naples Jail Center. However, the medical staff of ARMOR never obtained the necessary medications that Mr. Kusma utilized to control his blood glucose levels.

## COUNT I
## CLAIM AGAINST COLLIER COUNTY SHERIFF'S OFFICE
## VIOLATION OF 42 U.S.C.A. SECTION 1983

The Plaintiff reallege and reaffirm each and every allegation contained in paragraphs 1 through 70 of this Complaint as if fully asserted herein.

72.     At all times while Timothy Paul Kusma was within the exclusive custody and care of the COLLIER COUNTY SHERIFF'S OFFICE, Timothy Paul Kusma had the constitutional right to bodily integrity, including the right to have his medical needs met and attended to by ARMOR.

73.     The provision of healthcare services to detainees within a State or municipality's jail or correctional facility, such as Timothy Paul Kusma within the

21

Naples Jail Center, was and is a governmental act.

74.    At all times material hereto, the COLLIER COUNTY SHERIFF'S OFFICE has and had a non-delegable duty to provide adequate healthcare and services to pretrial detainees within the Naples Jail Center, including Timothy Paul Kusma.

75.    At all times material hereto, by virtue of the Inmate Healthcare Services Agreement, the COLLIER COUNTY SHERIFF'S OFFICE regulated and substantially funded ARMOR, who it contracted, to perform the governmental act of providing healthcare services to detainees within the Naples Jail Center, including Timothy Paul Kusma.

76.    At all times material hereto, the COLLIER COUNTY SHERIFF'S OFFICE had a duty to investigate, interview, research, and/or vet ARMOR prior to entering into the Inmate Healthcare Services Agreement to ensure that ARMOR was capable of providing adequate medical care to the inmates at the Naples Jail Center and the Immokalee Jail Center.

77.    At all times material hereto, COLLIER COUNTY SHERIFF'S OFFICE had a duty to develop and implement policies on the hiring, supervision, retention, and training of ARMOR and its employees working at the Naples Jail

Center and the Immokalee Jail Center for the provisions of adequate medical care to inmates at the Naples Jail Center.

78.     At all times material hereto, COLLIER COUNTY SHERIFF'S OFFICE made the policy decision to contract for inmate healthcare services through ARMOR even though the COLLIER COUNTY SHERIFF'S OFFICE knew or should have known that ARMOR provided insufficient, substandard, negligent, and gross negligent medical care to inmates across the United States.

79.     At all times material hereto, COLLIER COUNTY SHERIFF'S OFFICE made the policy decision to contract for inmate healthcare services through ARMOR even though the COLLIER COUNTY SHERIFF'S OFFICE knew or should have known that ARMOR would not provide inmate healthcare services in a manner that complied with the standard of care for medical professionals and the rules and regulations which ARMOR was obligated to follow.

80.     At all times material hereto, COLLIER COUNTY SHERIFF'S OFFICE made the policy decision to contract for inmate healthcare services through ARMOR even though the COLLIER COUNTY SHERIFF'S OFFICE knew or should have known that ARMOR had been terminated from other inmate healthcare service contracts throughout the United States as a result of ARMOR'S

HALBERG & FOGG, PLLC, ATTORNEYS AT LAW
BARRISTERS BUILDING, SUITE 3B, 1615 FORUM PLACE, WEST PALM BEACH, FL 33401 ● TEL. (561) 616-3000

prior failure to provide necessary and required medical services to inmates.

81.    At all times material hereto, as a result of the publicly known past incidences of ARMOR and the multiple allegations, complaints, civil actions, criminal actions, and publications regarding the bad acts of ARMOR, it was reasonably foreseeable to the COLLIER COUNTY SHERIFF'S OFFICE that constitutional violations to inmates would likely occur as a result of ARMOR'S bad conduct and insufficient, substandard, negligent, and gross negligent medical care.

82.    COLLIER COUNTY SHERIFF'S OFFICE breached its duties addressed in this count and abdicated it policymaking and oversight responsibilities, thereby allowing and making it foreseeable that the incident involving Timothy Paul Kusma could happen.

83.    Had COLLIER COUNTY SHERIFF'S OFFICE investigated, interviewed, researched, and/or vetted ARMOR prior to entering into the Inmate Healthcare Services Agreement, it would have determined that ARMOR had a pattern and practice of providing insufficient, substandard, negligent, and gross negligent medical care to inmates across the United States.

84.    COLLIER COUNTY SHERIFF'S OFFICE'S decision to enter into the

Inmate Healthcare Services Agreement with ARMOR, even though the COLLIER COUNTY SHERIFF'S OFFICE knew or should have known of ARMOR'S pattern and practice of providing insufficient, substandard, negligent, and gross negligent medical care to inmates across the United States, as well as the other bad acts enumerated above, constituted deliberate indifference to the rights and safety of Timothy Paul Kusma and all other inmates within the Naples Jail Center and the Immokalee Jail Center.

85.   COLLIER COUNTY SHERIFF'S OFFICE had actual or constructive knowledge of ARMOR'S longstanding and widespread practices referenced herein and failed to take action to stop it within the Naples Jail Center and the Immokalee Jail Center.

86.   COLLIER COUNTY SHERIFF'S OFFICE had a policy and/or custom to not reasonably scrutinize and/or evaluate ARMOR'S performance under the Inmate Healthcare Services Agreement and had a policy and/or custom of turning a blind eye to the insufficient medical care provided to the inmates.

87.   COLLIER COUNTY SHERIFF'S OFFICE had a policy and/or custom not to ensure that ARMOR complied with its contractual obligations to report, either in writing or in person, the COLLIER COUNTY SHERIFF'S OFFICE about

ARMOR'S performance under the Inmate Healthcare Services Agreement.

88.    COLLIER COUNTY SHERIFF'S OFFICE had a policy and/or custom of allowing and/or condoning for ratifying the provision of inadequate healthcare to inmates in the Naples Jail Center and the Immokalee Jail Center.

89.    COLLIER COUNTY SHERIFF'S OFFICE had a policy and/or custom of allowing, condoning, and/or ratifying the deliberate indifference to the healthcare needs of inmates in the Naples Jail Center and the Immokalee Jail Center, including but not limited to Timothy Paul Kusma.

90.    The aforementioned customs and/or policies in this Count were caused, in whole or in part, by the COLLIER COUNTY SHERIFF'S OFFICE knowing, actually and/or constructively, that the COLLIER COUNTY SHERIFF'S OFFICE was contractually indemnified by ARMOR from any claims arising from the Naples Jail Center and Immokalee Jail Center.

91.    COLLIER COUNTY SHERIFF'S OFFICE breached its duties addressed in this count by failing to investigate, interview, research, oversee, supervise, and/or vet ARMOR prior to entering into the Inmate Healthcare Services Agreement.

92.    COLLIER COUNTY SHERIFF'S OFFICE breached its duties

addressed in this count by contracting ARMOR as the provider of inmate healthcare services when it knew or should have known that ARMOR had a pattern and practice of providing insufficient, substandard, negligent, and gross negligent medical care to inmates, both in the Naples Jail Center and the Immokalee Jail Center, as well as across the United States.

93.    COLLIER COUNTY SHERIFF'S OFFICE breached its duties addressed in this count by retaining with ARMOR as the provider of inmate healthcare services when it knew or should have known that ARMOR had a pattern and practice of providing insufficient, substandard, negligent, and gross negligent medical care to inmates, both in the Naples Jail Center and the Immokalee Jail Center, as well as across the United States.

94.    At all times material hereto, COLLIER COUNTY SHERIFF'S OFFICE'S breaches subjected and/or caused Timothy Paul Kusma to be subjected to a deprivation of his federal constitutional right to adequate health care as a pretrial detainee at the Naples Jail Center.

95.    At all times material hereto, Timothy Paul Kusma was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including but not limited to, the

27

Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

96.     The policy decision of entering into the Inmate Healthcare Services Agreement with ARMOR was the moving force behind the constitutional deprivation of Timothy Paul Kusma's rights.

97.     As outlined throughout this Complaint, ARMOR employees breached respective duties of care to provide proper medical care to Timothy Paul Kusma while he was a resident at the Naples Jail Center.

98.     COLLIER COUNTY SHERIFF'S OFFICE also knew, or in the exercise of reasonable diligence should have known, about the patter of preventable deaths and/or onset of serious adverse health conditions to residents within the Naples Jail Center and Immokalee Jail Center, and at other facilities served by ARMOR, due to the delay and/or failure to render proper medical treatment, as well as by ARMOR history of providing substandard medical care.

99.     COLLIER COUNTY SHERIFF'S OFFICE also knew, or in the exercise of reasonable diligence should have known, that ARMOR employees working in the Naples Jail Center and the Immokalee Jail Center had a policy and/or custom of delaying the provision of reasonable and necessary medical care to residents.

HALBERG & FOGG, PLLC, ATTORNEYS AT LAW
BARRISTERS BUILDING, SUITE 3B, 1615 FORUM PLACE, WEST PALM BEACH, FL 33401 ● TEL. (561) 616-3000

100.   At all times material hereto, it was reasonably foreseeable that COLLIER COUNTY SHERIFF'S OFFICE'S aforementioned policies and/or customs set forth in this count, and the breaches of its duties as set forth in this Count, would place residents in the Naples Jail Center and Immokalee Jail Center, including Timothy Paul Kusma, within a zone of risk to being damaged, harmed, or dying.

101.   The *de facto* policies, customs, and practices complained of were the moving force behind the deprivation of Plaintiff's constitutional rights.

102.   The decision to contract with and retain ARMOR as the provider of inmate healthcare services was deliberate indifference to the life and safety of the residents of the Naples Jail Center and the Immokalee Jail Center.

103.   42 U.S.C. Section 1983 provides a remedy for violation of these rights.

104.   As a direct and proximate cause of COLLIER COUNTY SHERIFF'S OFFICE deliberate indifference as set forth in this Count, Timothy Kusma was injured and died.

105.   COLLIER COUNTY SHERIFF'S OFFICE's deliberate indifference was a violation of Timothy Paul Kusma's clearly established federal constitutional rights for which 42 U.S.C § 1983 provides a remedy.

106.    Attorney's fees and costs are sought pursuant to 42 U.S.C. Section 1988.

WHEREFORE, Plaintiff, demands judgment for damages, interest, and costs, against COLLIER COUNTY SHERIFF'S OFFICE, and a jury trial on all issues so triable as a matter of right.

**COUNT II**
**CLAIM AGAINST KEVIN RAMBOSK, IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF COLLIER COUNTY, FLORIDA**
**VIOLATION OF 42 U.S.C.A. SECTION 1983**

The Plaintiff reallege and reaffirm each and every allegation contained in paragraphs 1 through 70 of this Complaint as if fully asserted herein.

107.    At all times while Timothy Paul Kusma was within the exclusive custody and care of the COLLIER COUNTY SHERIFF'S OFFICE, Timothy Paul Kusma had the constitutional right to bodily integrity, including the right to have his medical needs met and attended to by ARMOR.

108.    The provision of healthcare services to pretrial detainees within a State or municipality's jail or correctional facility, such as Timothy Paul Kusma within the Naples Jail Center, was and is a governmental act.

109.    At all times material hereto, KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, has and had a non-delegable duty to

provide adequate healthcare and services to pretrial detainees within the Naples Jail Center, including Timothy Paul Kusma.

110. At all times material hereto, by virtue of the Inmate Healthcare Services Agreement, the KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, regulated and substantially funded ARMOR, who it contracted, to perform the governmental act of providing healthcare services to pretrial detainees within the Naples Jail Center, including Timothy Paul Kusma.

111. At all times material hereto, KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, had a duty to investigate, interview, research, and/or vet ARMOR prior to entering into the Inmate Healthcare Services Agreement to ensure that ARMOR was capable of providing adequate medical care to the inmates at the Naples Jail Center and the Immokalee Jail Center.

112. At all times material hereto, KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, had a duty to develop and implement policies on the hiring, supervision, retention, and training of ARMOR and its employees working at the Naples Jail Center and the Immokalee Jail Center for the provisions of adequate medical care to inmates at the Naples Jail Center.

113. At all times material hereto, KEVIN RAMBOSK, in his Official

Capacity as the Sheriff of Collier County, made the policy decision to contract for inmate healthcare services through ARMOR even though the COLLIER COUNTY SHERIFF'S OFFICE knew or should have known that ARMOR provided insufficient, substandard, negligent, and gross negligent medical care to inmates across the United States.

114.   At all times material hereto, KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, made the policy decision to contract for inmate healthcare services through ARMOR even though KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, knew or should have known that ARMOR would not provide inmate healthcare services in a manner that complied with the standard of care for medical professionals and the rules and regulations which ARMOR was obligated to follow.

115.   At all times material hereto, KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, made the policy decision to contract for inmate healthcare services through ARMOR even though KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, knew or should have known that ARMOR had been terminated from other inmate healthcare service contracts throughout the United States as a result of ARMOR'S prior failure to provide

necessary and required medical services to inmates..

116.    At all times material hereto, as a result of the publicly known past incidences of ARMOR and the multiple allegations, complaints, civil actions, criminal actions, and publications regarding the bad acts of ARMOR, it was reasonably foreseeable to KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, that constitutional violations to inmates would likely occur as a result of ARMOR'S bad conduct and insufficient, substandard, negligent, and gross negligent medical care.

117.    KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, breached his duties addressed in this count and abdicated it policymaking and oversight responsibilities, thereby allowing and making it foreseeable that the incident involving Timothy Paul Kusma could happen.

118.    Had KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, investigated, interviewed, researched, and/or vetted ARMOR prior to entering into the Inmate Healthcare Services Agreement, it would have determined that ARMOR had a pattern and practice of providing insufficient, substandard, negligent, and gross negligent medical care to inmates across the United States.

33

119.    KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, decision to enter into the Inmate Healthcare Services Agreement with ARMOR, even though KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, knew or should have known of ARMOR'S pattern and practice of providing insufficient, substandard, negligent, and gross negligent medical care to inmates across the United States, as well as the other bad acts enumerated above, constituted deliberate indifference to the rights and safety of Timothy Paul Kusma and all other inmates within the Naples Jail Center and the Immokalee Jail Center.

120.    KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, had actual or constructive knowledge of ARMOR'S longstanding and widespread practices referenced herein and failed to take action to stop it within the Naples Jail Center and the Immokalee Jail Center.

121.    KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, had a policy and/or custom to not reasonably scrutinize and evaluate ARMOR'S performance under the Inmate Healthcare Services Agreement and had a policy and/or custom of turning a blind eye to the insufficient medical care provided to the inmates.

34

122.    KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, had a policy and/or custom not to ensure that ARMOR complied with its contractual obligations to report, either in writing or in person, to KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, about ARMOR'S performance under the Inmate Healthcare Services Agreement.

123.    KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, had a policy and/or custom of allowing and/or condoning for ratifying the provision of inadequate healthcare to inmates in the Naples Jail Center and the Immokalee Jail Center.

124.    KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, had a policy and/or custom of allowing, condoning, and/or ratifying the deliberate indifference to the healthcare needs of inmates in the Naples Jail Center and the Immokalee Jail Center, including but not limited to Timothy Paul Kusma.

125.    The aforementioned customs and/or policies in this Count were caused, in whole or in part, by KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, knowing, actually and/or constructively, that the COLLIER COUNTY SHERIFF'S OFFICE was contractually indemnified by ARMOR from any claims arising from the Naples Jail Center and Immokalee Jail

Center.

126.   KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, breached its duties addressed in this count by failing to investigate, interview, research, oversee, supervise, and/or vet ARMOR prior to entering into the Inmate Healthcare Services Agreement.

127.   KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, breached its duties addressed in this count by contracting with ARMOR as the provider of inmate healthcare services when it knew or should have known that ARMOR had a pattern and practice of providing insufficient, substandard, negligent, and gross negligent medical care to inmates, both in the Naples Jail Center and the Immokalee Jail Center, as well as across the United States.

128.   KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, breached its duties addressed in this count by retaining ARMOR as the provider of inmate healthcare services when it knew or should have known that ARMOR had a pattern and practice of providing insufficient, substandard, negligent, and gross negligent medical care to inmates, both in the Naples Jail Center and the Immokalee Jail Center, as well as across the United States.

129.   At all times material hereto, KEVIN RAMBOSK'S, in his Official

Capacity as the Sheriff of Collier County, breaches subjected and/or caused Timothy Paul Kusma to be subjected to a deprivation of his federal constitutional right to adequate health care as a pretrial detainee at the Naples Jail Center.

130.   At all times material hereto, Timothy Paul Kusma was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

131.   The policy decision of entering into the Inmate Healthcare Services Agreement with ARMOR was the moving force behind the constitutional deprivation of Timothy Paul Kusma's rights.

132.   As outlined throughout this Complaint, ARMOR employees breached respective duties of care to provide proper medical care to Timothy Paul Kusma while he was a resident at the Naples Jail Center.

133.   KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, also knew, or in the exercise of reasonable diligence should have known, about the patter of preventable deaths and/or onset of serious adverse health conditions to residents within the Naples Jail Center and Immokalee Jail Center,

and at other facilities served by ARMOR, due to the delay and/or failure to render proper medical treatment, as well as by ARMOR history of providing substandard medical care..

134.   KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, also knew, or in the exercise of reasonable diligence should have known, that ARMOR employees working in the Naples Jail Center and the Immokalee Jail Center had a policy and/or custom of delaying the provision of reasonable and necessary medical care to residents.

135.   At all times material hereto, it was reasonably foreseeable that KEVIN RAMBOSK'S, in his Official Capacity as the Sheriff of Collier County, aforementioned policies and/or customs set forth in this count, and the breaches of its duties as set forth in this Count, would place residents in the Naples Jail Center and Immokalee Jail Center, including Timothy Paul Kusma, within a zone of risk to being damaged, harmed, or dying.

136.   The *de facto* policies, customs, and practices complained of were the moving force behind the deprivation of Plaintiff's constitutional rights.

137.   The decision to contract with and retain ARMOR as the provider of inmate healthcare services was deliberate indifference to the life and safety of the

residents of the Naples Jail Center and the Immokalee Jail Center.

138.   42 U.S.C. Section 1983 provides a remedy for violation of these rights.

139.   As a direct and proximate cause of KEVIN RAMBOSK'S, in his Official Capacity as the Sheriff of Collier County, deliberate indifference as set forth in this Count, Timothy Kusma was injured and died.

140.   KEVIN RAMBOSK'S, in his Official Capacity as the Sheriff of Collier County, deliberate indifference was a violation of Timothy Paul Kusma's clearly established federal constitutional rights for which 42 U.S.C § 1983 provides a remedy.

141.   Attorney's fees and costs are sought pursuant to 42 U.S.C. Section 1988.

WHEREFORE, Plaintiff, demands judgment for damages, interest, and costs, against KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, and a jury trial on all issues so triable as a matter of right.

## COUNT III
## CLAIM AGAINST COLLIER COUNTY SHERIFF'S OFFICE NEGLIGENCE

The Plaintiff reallege and reaffirm each and every allegation contained in paragraphs 1 through 70 of this Complaint as if fully asserted herein.

HALBERG & FOGG, PLLC, ATTORNEYS AT LAW
BARRISTERS BUILDING, SUITE 3B, 1615 FORUM PLACE, WEST PALM BEACH, FL 33401 ● TEL. (561) 616-3000

142.    At all times material hereto, COLLIER COUNTY SHERIFF'S OFFICE, has and had a non-delegable duty to provide adequate healthcare and services to pretrial detainees within the Naples Jail Center, including Timothy Paul Kusma.

143.    COLLIER COUNTY SHERIFF'S OFFICE contracted with ARMOR through the Inmate Healthcare Services Agreement, thereby delegating this duty to provide adequate healthcare and services at the Naples Jail Center and the Immokalee Jail Center to ARMOR.

144.    COLLIER COUNTY SHERIFF'S OFFICE chose and selected ARMOR for the provision of inmate healthcare services, and had a duty to adequately investigate, research, and vet ARMOR prior to contracting with it to provide inmate healthcare services.

145.    COLLIER COUNTY SHERIFF'S OFFICE had a duty to ensure that entities he contracted with for the provision of inmate healthcare services were capable of fulfilling the duty and responsibility of providing adequate and sufficient medical care to resident at the Naples Jail Center and the Immokalee Jail Center within the applicable standard of care.

146.    Based on the facts delineated in this Complaint, ARMOR was incapable of providing and failed to provide adequate and sufficient inmate

healthcare services within the requisite standard of care.

147. COLLIER COUNTY SHERIFF'S OFFICE breached the aforementioned duty by:

   a. Negligently failing to properly investigate ARMOR prior to entering into the Inmate Healthcare Services Agreement;

   b. Negligently failing to adequately research and vet ARMOR prior to entering into the Inmate Healthcare Services Agreement;

   c. Negligently retaining ARMOR as the provider of inmate healthcare services;

   d. Negligently failing to ensure that ARMOR employees were properly trained as the provider of inmate healthcare services;

   e. Negligently supervising ARMOR and its employees as the provider of inmate healthcare services;

   f. Negligently contracting with ARMOR to provide inmate healthcare services;

   g. Negligently failing to ensure compliance with the Inmate Healthcare Services Agreement;

   h. Negligently failing to review the performance of ARMOR nurses,

doctors, and medical staff in the provision of health services and care to residents, including Timothy Paul Kusma, at the Naples Jail Center;

i.  Negligently failing to review ARMOR employees' management and maintenance of medical charts and records, including Timothy Paul Kusma's;

j.  Negligently failing to recognize ARMOR employees' failure to diagnose medical conditions in residents at the Naples Jail Center, including Timothy Paul Kusma's;

k.  Negligently failing to review ARMOR decisions not to utilize emergency medical services for residents at the Naples Jail Center, including Timothy Paul Kusma;

l.  Negligently failing to review ARMOR decisions not to utilize ambulance services for residents at the Naples Jail Center, including Timothy Paul Kusma;

m. Negligently failing to review ARMOR decision to not order follow-up medical assessments by physicians for residents in the Naples Jail Center, including Timothy Paul Kusma;

42

n. Negligently failing to review ARMOR employees' decisions with respect to the provision of medical care for residents in the Naples Jail Center, including Timothy Paul Kusma; and

o. Negligently failing to act reasonably under the circumstances.

148. Had COLLIER COUNTY SHERIFF'S OFFICE properly investigated, interviewed, vetted, supervised, trained and/or oversaw ARMOR, KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, would have determined that ARMOR was incapable of providing consistent medical care within the appropriate standard of care.

149. As a direct and proximate result of the aforementioned breaches, Timothy Paul Kusma was injured and died. The Plaintiff makes the below listed claims for damages.

WHEREFORE, the Plaintiff demands judgment for damages against Defendant, COLLIER COUNTY SHERIFF'S OFFICE, trial by jury of all issues so triable by law and such other relief this Court may deem appropriate.

## COUNT IV
## CLAIM AGAINST KEVIN RAMBOSK, IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF COLLIER COUNTY, FLORIDA
## NEGLIGENCE

HALBERG & FOGG, PLLC, ATTORNEYS AT LAW
BARRISTERS BUILDING, SUITE 3B, 1615 FORUM PLACE, WEST PALM BEACH, FL 33401 ● TEL. (561) 616-3000

The Plaintiff reallege and reaffirm each and every allegation contained in paragraphs 1 through 70 of this Complaint as if fully asserted herein.

150.   At all times material hereto, KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, has and had a non-delegable duty to provide adequate healthcare and services to pretrial detainees within the Naples Jail Center, including Timothy Paul Kusma.

151.   KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, contracted with ARMOR through the Inmate Healthcare Services Agreement, thereby delegating the duty to provide adequate healthcare and services at the Naples Jail Center and the Immokalee Jail Center to ARMOR.

152.   KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, chose and selected ARMOR for the provision of inmate healthcare services, and had a duty to adequately investigate, research, and vet ARMOR prior to contracting with it to provide inmate healthcare services.

153.   KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, had a duty to ensure that entities he contracted with for the provision of inmate healthcare services were capable of fulfilling the duty and responsibility of providing adequate and sufficient medical care to resident at the Naples Jail

44

Center and the Immokalee Jail Center within the applicable standard of care.

154.   Based on the facts delineated in this Complaint, ARMOR was incapable of providing and failed to provide adequate and sufficient inmate healthcare services within the requisite standard of care.

155.   KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, breached the aforementioned duty by:

      a.   Negligently failing to properly investigate ARMOR prior to entering into the Inmate Healthcare Services Agreement;

      b.   Negligently failing to adequately research and vet ARMOR prior to entering into the Inmate Healthcare Services Agreement;

      c.   Negligently retaining ARMOR as the provider of inmate healthcare services;

      d.   Negligently failing to ensure that ARMOR employees were properly trained as the provider of inmate healthcare services;

      e.   Negligently supervising ARMOR and its employees as the provider of inmate healthcare services;

      f.   Negligently contracting with ARMOR to provide inmate healthcare services;

g.  Negligently failing to ensure compliance with the Inmate Healthcare Services Agreement;

h.  Negligently failing to review the performance of ARMOR nurses, doctors, and medical staff in the provision of health services and care to residents, including Timothy Paul Kusma, at the Naples Jail Center;

i.  Negligently failing to review ARMOR employees' management and maintenance of medical charts and records, including Timothy Paul Kusma's;

j.  Negligently failing to recognize ARMOR employees' failure to diagnose medical conditions in residents at the Naples Jail Center, including Timothy Paul Kusma's;

k.  Negligently failing to review ARMOR decisions not to utilize emergency medical services for residents at the Naples Jail Center, including Timothy Paul Kusma;

l.  Negligently failing to review ARMOR decisions not to utilize ambulance services for residents at the Naples Jail Center, including Timothy Paul Kusma;

46

m. Negligently failing to review ARMOR decision to not order follow-up medical assessments by physicians for residents in the Naples Jail Center, including Timothy Paul Kusma;

n. Negligently failing to review ARMOR employees' decisions with respect to the provision of medical care for residents in the Naples Jail Center, including Timothy Paul Kusma; and

o. Negligently failing to act reasonably under the circumstances.

156. Had KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, properly investigated, interviewed, vetted, supervised, trained and/or oversaw ARMOR, KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier County, would have determined that ARMOR was incapable of providing consistent medical care within the appropriate standard of care.

157. As a direct and proximate result of the aforementioned breaches, Timothy Paul Kusma was injured and died. The Plaintiff makes the below listed claims for damages.

WHEREFORE, the Plaintiff demands judgment for damages against Defendant, KEVIN RAMBOSK, in his Official Capacity as the Sheriff of Collier

County, trial by jury of all issues so triable by law and such other relief this Court may deem appropriate.

## CLAIMS FOR DAMAGES FOR ALL COUNTS

158.    As a direct and proximate result of the aforementioned violations of civil rights, as well as the negligence of the Defendants, which caused the injuries of Timothy Paul Kusma, the Plaintiff sets forth below the listed claims.

## CLAIM ON BEHALF OF THE ESTATE OF TIMOTHY PAUL KUSMA

159.    As a direct and proximate result of the negligence of the Defendants that caused the death of Timothy Paul Kusma, the Plaintiff seeks damages on behalf of Decedent's estate as follows:

  a. Loss of net accumulations beyond death and into the future;

  b. Medical and funeral expenses incurred which have become a charge on said estate and/or which have bene paid on behalf of the decedent.

## CLAIM ON BEHALF OF YULISA ELIZABETH SANCHEZ CARRILLO, as surviving spouse

160.    As a direct and proximate result of the negligence of the Defendant that caused the death of Timothy Paul Kusma, his spouse, YULISA ELIZABETH SANCHEZ CARRILLO, has in the past and will in the future continue to suffer:

     a.    Value of loss, support and services from the date of death of Timothy Paul Kusma;

     b.    Loss of consortium and decedent's companionship and protections; and

     c.    Mental pain and suffering from the date of death and into the future.

161.   YULISA ELIZABETH SANCHEZ CARRILLO injuries are either permanent or continuing in nature and the Plaintiff will suffer the aforementioned losses and impairment in the future.

WHEREFORE, the Plaintiff demands judgment for damages against Defendants and demand a trial by jury of all issues so triable by law and such other relief this Court may deem appropriate.

DATED this 9th day of April, 2021.

               Respectfully submitted,
               **HALBERG & FOGG, PLLC**
               Barristers Building
               1615 Forum Place, Suite 3-B
               West Palm Beach, FL  33401
               PH:    (561) 616-3000
               FAX:  (561) 688-0775
               Service@HalbergLaw.com

                   */s/ Ryan A. Fogg*
BY:_____
               RYAN A. FOGG (68773)