UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ROGER MACAULEY, as the Personal
Representative of the Estate of
Timothy Paul Kusma, Deceased,

      Plaintiff,

v.                                                  Case No. 2:21-cv-300-JLB-NPM

COLLIER COUNTY SHERIFF'S OFFICE
and KEVIN RAMBOSK, in his official
capacity as the Sheriff of Collier County,
Florida,

      Defendants.

_____

# ORDER

Timothy Paul Kusma tragically passed away while detained in the Naples Jail Center, a facility where medical services were provided by Armor Correctional Health Services, Inc. ("Armor"), a private contractor. Plaintiff Roger Macauley, as personal representative of Mr. Kusma's estate ("the Estate"), now sues Defendants Collier County Sherriff's Office ("CCSO") and Sheriff Kevin Rambosk, in his official capacity as the Sheriff of Collier County, Florida.

The Estate brings two claims against each defendant arising from Mr. Kusma's death: (1) violation of 42 U.S.C. § 1983 for deliberate indifference to Mr. Kusma's medical needs, and (2) negligence under Florida law. Each claim relies on the same basic premise: Defendants failed to properly screen, supervise, or train Armor. The Estate alleges that, as a result, Armor did not provide Mr. Kusma— who was diabetic—with the correct insulin medication and did not timely provide

him with emergency services as his condition worsened.  Defendants move to dismiss all four counts for various reasons, including lack of capacity to sue CCSO, failure to state a claim, state-law sovereign immunity, and failure to comply with the presuit screening requirements in Chapter 766, Florida Statutes.  (Doc. 13.)

The parties agree that Counts I and III of the complaint should be dismissed because CCSO does not have capacity to be sued under Florida law.  Accordingly, those claims are **DISMISSED WITH PREJUDICE**.  After carefully reviewing the parties' remaining arguments, the Court holds that Count II must be **DISMISSED WITHOUT PREJUDICE** for failure to state a claim, but the Estate will be granted leave to amend.  Count IV will be **DISMISSED WITHOUT PREJUDICE** and without leave to amend on the basis of sovereign immunity and **DISMISSED WITH PREJUDICE** for failure to comply with Chapter 766, Florida Statutes.

<u>BACKGROUND</u>[1]

In 2015, Armor and Sheriff Rambosk executed a contract under which Armor agreed to provide medical services to inmates at the Naples Jail Center in exchange for a baseline compensation of $4,883,121.00.  (Doc. 1-2 ¶ 36.)  The contract included an annual cap of $750,000 for "off-site medical services," which the Estate

---

[1] "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  <u>Bryant v. Avado Brands, Inc.</u>, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citing <u>Hawthorne v. Mac Adjustment, Inc.</u>, 140 F.3d 1367, 1370 (11th Cir. 1998)).  A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Under this standard, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

describes as a disincentive for Armor to seek off-site treatment for inmates.  (Id.; Doc. 1, ¶ 26.)  Armor was also obligated to create a quality assurance program "of regularly scheduled audits of health care services," which was required to be supervised by a third-party consultant retained at Armor's expense.  (Doc. 1, ¶ 27; Doc. 1-2, ¶ 24.)  According to the Estate, Sheriff Rambosk agreed to this contract without properly screening Armor's alleged track record of medical negligence in various jails outside of Florida.  (Doc. 1, ¶¶ 28–46, 111–16.)

On March 28, 2019, Mr. Kusma—a Type 1 diabetic since childhood—was arrested by CCSO for driving with a suspended license.  (Id., ¶¶ 47, 49.)  He was booked into the Naples Jail Center and denied bond because of a prior probation violation.  (Id., ¶ 48.)  At the time of his booking, Mr. Kusma's blood glucose level was normal for someone with his condition.  (Id., ¶ 51.)  However, Armor's medical staff allegedly failed to provide Mr. Kusma with his "normal long acting insulin." (Id., ¶ 55.)  As a result, Mr. Kusma's blood glucose level "began to skyrocket."  (Id.)

Over the next several days, Mr. Kusma "repeatedly informed" Armor's staff that his blood sugar level was too high, and the insulin being provided to him was not helping.  (Id., ¶¶ 56–57.)  But Mr. Kusma's appeals were apparently ignored, even as he became visibly ill.  Over the next two weeks, Mr. Kusma experienced multiple symptoms associated with a high blood-sugar level, including loss of consciousness, vomiting, coughing up blood, chest pain, and diarrhea.  (Id., ¶¶ 58– 65.)  Despite these conspicuous symptoms—and despite being placed in the medical

observation unit at least once—Mr. Kusma was not provided with different insulin medication or transported to an emergency room.  (Id.)

On April 11, 2019, after returning from a court hearing, Mr. Kusma became so ill that he defecated on himself.  (Id., ¶ 66.)  Rather than being given medical attention, Mr. Kusma was "placed in a shower," where he collapsed.  (Id., ¶ 66.) When chest compressions and epinephrine proved ineffective, Mr. Kusma was transported to North Collier Hospital in an unresponsive state.  (Id., ¶ 68.) "Laboratory studies" of his blood at the hospital showed that he was "in a state of severe diabetic ketoacidosis."  (Id.) Shortly after arriving at the hospital, Mr. Kusma was pronounced dead.  (Id., ¶ 70.)

## DISCUSSION

### I.   The parties agree that Counts I and III against the CCSO must be dismissed due to lack of capacity.

Under Federal Rule of Civil Procedure 17(b)(3), "[t]he law of the state in which the district court is located generally determines a party's capacity to sue or be sued."  Williams v. Monroe Cnty. Dist. Att'y, 702 F. App'x 812, 813 (11th Cir. 2017).  In Florida, "there are constitutionally created political subdivisions called counties and separately created constitutional officers, including a sheriff."  Spry v. Turner, No. 8:11-cv-531-T-33TGW, 2011 WL 940343, at *2 (M.D. Fla. Mar. 17, 2011) (citing Fla. Const. art. VIII, §§ 1(a), (d)).  But "no provision is made constitutionally or statutorily for a 'Sheriff's Department' as a separate legal entity, as an agency of the county, or as a corporate entity, nor is a Sheriff's Department given authority to be sued in such a name."  Id. (collecting cases).  Thus, Florida "has not established

Sheriff's offices as separate legal entities with the capacity to be sued." <u>Faulkner v. Monroe Cnty. Sheriff's Dep't</u>, 523 F. App'x 696, 701 (11th Cir. 2013).

The parties agree that Counts I and III, which are against CCSO, must be dismissed for lack of capacity.  (Doc. 13 at 4–5; Doc. 20 at 5–6.)  Based on the law above, the Court agrees and will dismiss those counts without prejudice.[2]

## II.   The Estate fails to state a <u>Monell</u> claim against Sheriff Rambosk in his official capacity.

Sheriff Rambosk moves to dismiss Count II because the Estate has not identified any policy that would create liability under <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).  (Doc. 13. at 5–12.)  The Estate identifies two policy decisions that, in its view, expose Sheriff Rambosk to <u>Monell</u> liability: (1) hiring Armor to provide medical services in the Naples Jail Center despite its allegedly poor track record, and (2) inadequately supervising, training, or retaining Armor once it was hired.  (Doc. 20 at 6–13.)  The Court will begin with the basic principles of local government liability under <u>Monell</u>, followed by the essential elements of a claim for deliberate indifference to medical needs under the Fourteenth Amendment.  The Court will then discuss the Estate's two theories of liability and explain why the complaint, in its current form, does not state a claim under either theory.

---

[2] For clarity's sake, the Court suggests that the amended complaint name Collier County as the defendant, because that is the functional equivalent of naming Sheriff Rambosk in his official capacity.  <u>See</u> <u>Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.</u>, 402 F.3d 1092, 1115 (11th Cir. 2005).

## A. Monell liability.

Count II seeks to hold Sheriff Rambosk liable for improperly hiring, training, and supervising Armor under 42 U.S.C. § 1983.  Section 1983 creates a cause of action against any "person" who deprives someone of their federally protected rights under color of state law.  The Supreme Court has held that local government entities are "persons" under section 1983 but "cannot be held liable . . . on a respondeat superior theory."  Monell, 436 U.S. at 691.  Instead, local governments can only be held liable under section 1983 when they execute a "policy or custom" that "inflicts the injury."  Id. at 694.  Local government liability under Monell may be based on "(1) an express policy; (2) a widespread practice so permanent and well-settled that it constitutes a custom; or (3) an act or decision of an officer with final policy-making authority."  Boudreaux v. McArtor, 681 F. App'x 800, 804 (11th Cir. 2017) (citing Cuesta v. Sch. Bd., 285 F.3d 962, 966–68 (11th Cir. 2002)).

## B. Deliberate indifference.

Pretrial detainees have a right to adequate medical care under the Due Process Clause of the Fourteenth Amendment.  Hamm v. DeKalb Cnty., 774 F.2d 1567, 1574 (11th Cir. 1985).  The minimum standard of medical care required by the Due Process Clause is identical to the standard for convicted persons under the Eighth Amendment.  Id.  Accordingly, to prevail on a section 1983 claim for inadequate medical care, a pretrial detainee must demonstrate that jail officials acted with deliberate indifference to the detainee's medical needs.  Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  When bringing a claim under Monell, the detainee must demonstrate

not only that his Fourteenth Amendment rights were violated, but also that the local government entity "had a custom or policy that constituted deliberate indifference," and that this "policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)).

"A deliberate-indifference claim has two components: an objectively serious medical need, and subjective deliberate indifference to that need." Hannah v. Armor Corr. Health Servs. Inc., 792 F. App'x 742, 744 (11th Cir. 2019) (per curiam) (citing Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004)). "An objectively serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)). Subjective deliberate indifference requires: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Id. at 745 (quoting Brown, 387 F.3d. at 1351).

## C.    Deliberately indifferent hiring.

The Estate first argues that the complaint states a Monell claim against Sheriff Rambosk for the deliberately indifferent hiring of Armor.  (Doc. 20 at 8–9.) In other words, Sheriff Rambosk is liable under section 1983 because, according to the Estate, he hired Armor despite failing to adequately screen its history of substandard medical care in other jails across the country.  (Id.)  Had he properly screened Armor, the Estate contends, he would have realized that Armor was not capable of providing competent medical care to detainees in the Naples Jail

7

Center.  (Id.)  The policy decision to hire Armor, therefore, rose to the level of deliberate indifference.  (Id.)

In Board of County Commissioners v. Brown, the Supreme Court held that a local government's decision to hire someone without adequate screening could result in liability under Monell if the plaintiff can demonstrate that the hiring "reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision."  520 U.S. 397, 411 (1997).  In other words:

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

Id. (emphasis added).  This is a high bar.  The Brown Court demanded "rigorous requirements of culpability and causation" to ensure that Monell liability does not collapse into respondeat superior liability.  Id. at 415.  "[A] court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged."  Id. at 410.  In other words, "the connection between the background of the particular applicant and the specific constitutional violation alleged must be strong."  Id. at 412.  A "mere probability" that any inadequately screened employee "will inflict any constitutional injury" will not suffice.  Id.  To prevail, the plaintiff must show that the specific employee who injured them "was highly likely to inflict the particular injury suffered by the plaintiff."  Id.[3]

---

[3] The Court assumes that the distinction between employees and contractors is not important for purposes of Brown.  In any event, the parties have not challenged this distinction.

Here, the particular injury alleged in the complaint is that Mr. Kusma passed away due to complications from diabetic ketoacidosis after Armor medical staff at the Naples Jail Center failed to provide him with the same kind of insulin medication he had at home and failed to transport him to an emergency room as his health deteriorated.  (Doc. 1, ¶¶ 15–71.)  To state a <u>Monell</u> claim for deliberately indifferent hiring against the Sheriff, the Estate's complaint must plausibly allege a strong connection between this injury and Armor's background.

The Estate attempts to make such a connection by providing numerous examples of other people who have died in jails where Armor was providing medical care.  (<u>Id.</u>, ¶¶ 26–46.)  Despite this considerable effort, the Court cannot discern any plausible connection between these incidents and the injury suffered by Mr. Kusma. Many of the incidents are not discussed in meaningful detail—the complaint simply provides that a person was injured by "medical negligence" in an Armor facility, and the injury was "preventable."  (<u>Id.</u>, ¶¶ 30–37.)  The few times where a specific cause of death is mentioned (<u>e.g.</u>, sepsis, pneumonia), it does not resemble Mr. Kusma's (diabetic ketoacidosis). (<u>Id.</u>, ¶¶ 28–29.)  The complaint also discusses various other alleged practices that have little to do with Mr. Kusma's injury, like falsifying medical records and improperly receiving no-bid contracts.  (<u>Id.</u>, ¶¶ 40, 42.)

More helpfully, the Estate cites a 2016 lawsuit by the Attorney General of New York against an Armor entity for various improper practices at the Nassau County Correctional Center and Niagara County's jail from 2011 to 2016, which allegedly resulted in fourteen inmate deaths.  <u>See</u> Verified Petition, <u>People v. Armor</u>

9

Corr. Health Med. Servs. of N.Y., P.C. No. 450835/2016 (N.Y. Sup. Ct. July 11,

2016) [hereinafter "NYAG Petition"].  The Attorney General's petition alleges

several improper practices by Armor, including failure to "provide access to

medications" and "facilitate off-site specialty services."  Id., ¶¶ 7, 24.  But the

petition was filed in July 2016.  The contract between Sheriff Rambosk and Armor

was executed in September 2015—ten months before the Attorney General of New

York commenced his lawsuit.  It would have been impossible for Sheriff Rambosk to

find the petition while screening Armor's performance history because the petition

did not exist when the contract was executed.[4]  Thus, the petition does not support

a plausible inference of deliberate indifference by Sheriff Rambosk.

---

[4] The Estate's complaint also cites an article from Courthouse News Service which states that the Attorney General's lawsuit was settled.  (Doc. 1 at 11, ¶ 38.) That settlement did not involve any admission of liability.  See Stipulation of Settlement and Discontinuance, People v. Armor Corr. Health Med. Servs. of N.Y., P.C. No. 450835/2016 (N.Y. Sup. Ct. Oct. 5, 2016).  District courts in the Eleventh Circuit seem to be divided on the question of whether a settled lawsuit that did not result in an admission of liability can be used to support a Monell claim at the pleading stage.  Compare Johnson v. Israel, No. 17-62291-CIV, 2020 WL 1060007, at *8 (S.D. Fla. Mar. 5, 2020) (finding that settled lawsuit with no admission of liability does not support Monell claim at pleading stage), with Young v. Miami-Dade Cnty., No. 16-23852-CIV, 2020 U.S. Dist. LEXIS 239470, at *12 & n.9 (S.D. Fla. Dec. 21, 2020) (finding that a consent decree without an admission of liability does support Monell claim at the pleading stage but implying that it may not be enough to survive summary judgment).  At least one federal circuit has concluded that a consent decree without an admission of liability could support an inference of deliberate indifference in a complaint.  Est. of Roman v. City of Newark, 914 F.3d 789, 799 (3d Cir. 2019).  In any event, the Court does not need to resolve this difficult question because the New York lawsuit postdates Armor's agreement with Sheriff Rambosk.  To the extent Sherriff Rambosk's renewal of the contract postdated the NYAG Petition, the Court treats that as a negligent retention theory, which is addressed below.

The only other allegations in the complaint supporting <u>Monell</u> liability provide that, upon "information and belief," Armor routinely avoided sending patients to hospitals as a way to save money.  (Doc. 1, ¶¶ 43–45.)  The Eleventh Circuit recently explained that facts based on "information and belief" could support a <u>Monell</u> claim at the pleading stage when they are based on "'sufficient data to justify' an allegation on the matter."  <u>Sosa v. Martin Cnty.</u>, 13 F.4th 1254, 1279 (11th Cir. 2021) (quoting 5 Charles A. Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 1224 (3d ed. 2012)).  As the Court has explained, however, the complaint does not contain "sufficient data" to justify such allegations.  Thus, Count II fails to state a <u>Monell</u> claim based on deliberately indifferent hiring.

### D.    Deliberately indifferent training/supervision.

The Estate also argues that the complaint states a claim for deliberately indifferent "supervision, retention, and training" of Armor.  (Doc. 1, ¶ 112.)  These types of claims are generally governed by <u>City of Canton v. Harris</u>, where the Supreme Court explained that there are "limited circumstances" under which a failure to train can support <u>Monell</u> liability.[5]  489 U.S. 378, 387 (1989).  At the same time, the Supreme Court emphasized that <u>Monell</u> will not be satisfied by "merely alleging that [an] existing training program for a class of employees . . . represents a policy for which [a local government entity] is responsible."  489 U.S. at 389.  "[T]he focus must be on adequacy of the training program in relation to the tasks the particular [employees] must perform."  <u>Id.</u> at 390.  In other words, there must be a

---

[5] <u>See, e.g.</u>, <u>Butler v. Nance</u>, No. 4:01-CV-0093-A, 2002 WL 1042133, at *5 (N.D. Tex. May 21, 2002) (applying <u>Canton</u> to all three types of claims).

11

"direct causal link" between the training and "the alleged constitutional deprivation." Id. at 386 (emphasis added).  Negligent administration of an otherwise sound training program does not create Monell liability, and neither do allegations that an injury could have been avoided by better training if the existing program adequately enabled the employee "to respond properly to the usual and recurring situations with which they must deal."  Id. at 390–91.

Canton provides two situations in which training deficiencies would establish deliberate indifference: (1) the need for training is "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"; and (2) employees "so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need."  489 U.S. at 390 & n.10.

With respect to the first theory, a plaintiff must do more than provide conclusory allegations that the defendant's program of training or supervision was inadequate.  Rather, the plaintiff should "provide [some] specifics as to what they contend would have been constitutionally adequate training" and "why the need for that very specific training would have been obvious" to the defendant.  Vielma v. Gruler, 808 F. App'x 872, 883 (11th Cir. 2020) (per curiam) (upholding dismissal of inadequate training claim against officer who responded to Pulse nightclub shooting); see also Stafford v. City of Argo, 514 F. Supp. 3d 1353, 1368 (N.D. Ala. 2021) ("Absent any factual allegations at least as to why it was highly predictable

an officer who did not know how to handle dog encounters would violate citizens' constitutional rights or what training would have been adequate to equip an officer with this knowledge, the type of municipal liability hypothesized by the Supreme Court in <u>Canton</u> cannot reasonably be inferred from the amended complaint.").

The Estate's complaint does not provide any such specifics; there are no allegations as to what specific type of training or supervision Sheriff Rambosk should have used to manage his relationship with Armor, and why the need for that specific training should have been obvious.

It is fairly common knowledge that depriving a diabetic of insulin may be dangerous.  <u>See</u> <u>Naphier v. Cnty. of Genesee</u>, No. 11-13754, 2012 WL 6652945, at *8 (E.D. Mich. Dec. 21, 2012) ("It takes no medical training to understand that when a diabetic is deprived of her insulin, grave consequences follow.").  But Mr. Kusma was not entirely deprived of insulin; the complaint alleges that Mr. Kusma's "at-home insulin medication was <u>different</u> than the one being provided to him at the Naples Jail Center," and that he was not transported to an emergency room as his condition worsened.  (Doc. 1, ¶¶ 63, 71) (emphasis added).  The Estate does not provide any details about what system of supervision should have been in place to ensure that Armor was prescribing the <u>correct kind</u> of medication to diabetic inmates or transporting those inmates to emergency rooms when the need arose. Likewise, the Estate provides no explanation of why the need for that type of training or supervision should have been obvious to Sheriff Rambosk.  At most, the complaint alleges that Sheriff Rambosk had a duty to implement policies of

adequate training and supervision, without specifying what they should have been.  (Doc. 1, ¶ 112.)  That is not enough to state a claim.

With respect to the second theory, the complaint does not sufficiently allege that Armor "so often violate[d] constitutional rights that the need for further training must have been plainly obvious."  City of Canton, 489 U.S. at 390 n.10.  As the Court previously explained, most of the other incidents cited in the complaint are not described in any meaningful detail.  See supra at 9–10.  And the more detailed examples do not seem to involve the same types of issues as this case.[6]  Id.

In sum, the Court will dismiss Count II of the complaint for failure to state a claim.  The Court's dismissal, however, will be without prejudice to the Estate to file an amended complaint that more closely tracks the controlling Supreme Court precedent discussed in this Order.  Monell claims—and particularly Monell claims that proceed under a Canton theory—are notoriously difficult to navigate.  That difficulty is a feature, not a bug.  See Gold v. City of Miami, 151 F.3d 1346, 1351

---

[6] Once again, the Court emphasizes that the law is unclear on whether a settlement which did not involve any admission of liability may be considered as proof that Armor frequently violated constitutional rights.  See supra note 4.  But even if the Court could consider the New York Attorney General's lawsuit, it does not seem to plausibly establish—on its own—that Sheriff Rambosk should have expected Armor to violate Mr. Kusma's constitutional rights.  The petition cites fourteen deaths in two facilities where Armor provided medical care.  NYAG Petition at ¶ 6.  Of those fourteen deaths, seven were found to involve "egregious lapses in medical care" by a medical review board at the time of the petition.  Id.  And only two of those deaths are directly attributed to inadequate access to medication—an issue that receives comparatively little discussion in the forty-three-page petition.  Cf. id. at ¶¶ 93–110.  That said, the Court may be willing to reconsider the NYAG petition in an amended complaint that is drafted with the legal principles in Canton and controlling authorities in mind.

n.10 (11th Cir. 1998) (noting that the "high standard of proof" for such claims is "intentionally onerous for plaintiffs").  The Court does not expect the Estate to provide decisive proof of its claims at the pleading stage.  But for now, the Court needs more specific allegations, and it needs them in a form that is consistent with the controlling case law.  Vielma, 808 F. App'x at 883.

III.   **The Estate's state-law negligence claims must be dismissed for failure to comply with Florida's presuit screening requirements.**

Count IV is a state-law negligence claim against Sheriff Rambosk for negligently hiring and retaining Armor.  (Doc. 1, ¶¶ 150–57.)  Sheriff Rambosk argues that Count IV of the complaint must be dismissed because, among other things: (1) he is sovereignly immune from any claims arising from his operational functions; and (2) the Estate has not complied with the presuit screening requirements of Chapter 766, Florida Statutes, which governs medical malpractice claims.  (Doc. 13 at 12–16.)  The Estate responds that: (1) the Sheriff's actions are discretionary, not operational; and (2) the presuit screening requirements in Chapter 766 do not apply to Count IV because it is not a claim for medical negligence.  (Id. at 13–20.)

While state-law sovereign immunity is not a "jurisdictional" bar to federal courts, this Court will nevertheless address it first because state law governs the Estate's negligence claim, and a state court would have to address sovereign immunity as a threshold question.  See Jones v. United Space All., L.L.C., 494 F.3d 1306, 1309 (11th Cir. 2007) ("[W]e apply substantive Florida law to state claims heard on the basis of supplemental jurisdiction . . . .");  see also Posen Const., Inc. v.

15

Lee Cnty., 921 F. Supp. 2d 1350, 1357 (M.D. Fla. 2013) (noting that state sovereign immunity is "not a jurisdictional bar to this Court's ability to adjudicate a claim; it is merely a rule of decision that will dictate whether the claim being asserted can be successfully prosecuted").

A.   **State sovereign immunity.**

Florida and its subdivisions, including counties, are protected by sovereign immunity "unless such immunity is waived by legislative enactment or constitutional amendment." Fla. Fish & Wildlife Conservation Comm'n v. Hahr, No. 1D20-2578, 2021 WL 3507747, at *1 (Fla. 1st DCA Aug. 9, 2021) (citing Art. X, § 13, Fla. Const.) The Florida Tort Claims Act ("FTCA") creates a limited waiver of sovereign immunity for torts. See Fla. Stat. § 768.28(1). Despite the FTCA, the Florida Supreme Court has held that "certain 'discretionary' governmental functions remain immune from tort liability." Com. Carrier Corp. v. Indian River Cnty., 371 So. 2d 1010, 1022 (Fla. 1979). In other words, the FTCA creates tort liability only for government actions that are "operational in nature," as opposed to "discretionary." Kaisner v. Kolb, 543 So. 2d 732, 736 (Fla. 1989).

"[T]he term 'discretionary' as used in this context means that the governmental act in question involved an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." Id. at 737 (citing Dep't of Health & Rehab. Servs. v. Yamuni, 529 So. 2d 258, 260 (Fla. 1988)). "An 'operational' function, on the other hand, is one not necessary to or inherent in

16

policy or planning, that merely reflects a secondary decision as to how those policies or plans will be implemented."[7]  Id.

Depending on the facts of the case, hiring decisions may fall on either the discretionary or the operational side of the fence.  On one hand, hiring a lower-level employee is an operational activity.  Dickinson v. Gonzalez, 839 So. 2d 709, 713 (Fla. 3d DCA 2003) (police officer); Willis v. Dade Cnty. Sch. Bd., 411 So. 2d 245, 246 (Fla. 3d DCA 1982) (teacher).  On the other hand, the decision to hire "a top executive appointee" is discretionary activity.  Storm v. Town of Ponce Inlet, 866 So. 2d 713, 719 (Fla. 5th DCA 2004) (chief building inspector hired by town council).

Likewise, retention or supervision may be either operational or discretionary. A negligence claim based on the defendant's lack of an appropriate policy to train or supervise employees would be barred by sovereign immunity because policymaking is a discretionary activity.  See Lewis v. City of St. Petersburg, 260 F.3d 1260, 1266 (11th Cir. 2001) ("A city's decision regarding how to train its officers and what subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning.").  But the implementation and operation of an existing training program could be an operational activity.  See Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402

---

[7] According to the Florida Supreme Court, this basic definition can be "illuminated" by a four-part test, which essentially asks: (1) does the challenged act involve a basic policy, (2) is the act essential to accomplishing that policy, (3) does it require basic policy judgment, evaluation, or expertise, and (4) does the government agency possess the legal authority and duty to carry out the action?  Id. at 736 (citing Evangelical United Brethren Church of Adna v. State, 407 P.2d 440, 445 (Wash. 1965)).

F.3d 1092, 1119 n.13 (11th Cir. 2005) ("Because Cook's vicarious liability claim challenges the manner in which [a detention center's] procedures were implemented through individual corrections officers—not the procedures themselves—that claim is not barred by sovereign immunity.").[8]

Courts disagree on what to do when a plaintiff's allegations are not clear enough to determine whether the defendant's actions were discretionary or not. Some courts dismiss the claim. See Guarda v. City of Melbourne, No. 6:17-cv-756-Orl-37TBS, 2017 WL 3034071, at *4 (M.D. Fla. July 18, 2017) ("Plaintiff's allegations are insufficiently precise to determine if immunity for discretionary acts is available.  Hence, repleader is necessary for this reason as well.").  Others allow the claims to go forward.  See Hemmings v. Jenne, No. 10-61126-CIV, 2010 WL 4005333, at *7 (S.D. Fla. Oct. 12, 2010) ("[T]he Court cannot yet determine whether sovereign immunity bars Ms. Hemmings' negligent hiring, retention, and supervision claims, and thus will not dismiss these claims at this stage.").

With all of this in mind, the Court is concerned that some (or all) of the Estate's negligence theories may be barred by sovereign immunity.  Florida provides that a contract for provision of services to a county detention facility must be approved by the county's governing body with a vote of majority-plus-one, after "consultation" with the sheriff.  See Fla. Stat. § 951.062(1); see also Kimbrough v. City of Cocoa, 6:05-cv-471-Orl-31KRS, 2006 WL 2864383, at *4 (M.D. Fla. Oct. 5,

---

[8] The irony is that this standard seems to be a mirror inverse of the federal standard set forth Canton, under which negligent administration of an otherwise sound training program does not create Monell liability.

18

2006) (noting that a county is not relieved of this responsibility even if it delegates responsibility for its jails to the sheriff).  Oddly enough, the Court cannot locate a single case addressing the question of whether approval of a contract under section 951.062 by a board of county commissioners is a "discretionary" or "operational" activity.  Yet the mere fact that legislative approval is required suggests to the Court that a multimillion-dollar contract to provide medical services in a county detention facility is more analogous to Storm than it is to Dickinson or Willis.  In other words, it seems more like a policy decision than a lower-level personnel management decision.  Cf. City of Pembroke Pines v. Corr. Corp. of Am., 274 So. 3d 1105, 1111 (Fla. 4th DCA 2019) (holding that a municipality adopting a resolution opposing a private prison company's construction of a federal immigration detention facility in an adjacent town was a discretionary activity, as was its decision to terminate an interlocal agreement that would have provided emergency medical and fire services to the facility).

The Estate's theories of negligent retention and training suffer from similar issues.  The complaint does not make clear whether Sheriff Rambosk's allegedly negligent supervision was due to the absence of a policy or the improper implementation of an existing policy.  In some paragraphs, the complaint suggests that Armor "had sole decision-making authority over the medical care provided to inmates at Naples Jail Center," suggesting that there was no oversight policy whatsoever.  (Doc. 1, ¶ 54.)  To the extent that Armor may have failed to take actions that were necessary to save Mr. Kusma's life, that failure allegedly

contradicted Armor's "own internal policy." (Id., ¶ 56.)  Other paragraphs could be read to suggest that Sheriff Rambosk had a preexisting policy of supervision that he failed to implement.  (Id., ¶¶ 77, 112, 155.)  The only mention of an oversight policy in the contract is paragraph 24, which requires Armor to establish a "Quality Assurance Program" supervised by a third-party consultant that Armor must retain at its own expense.  (Doc. 1-2 at 9, ¶ 24.)  In fairness, the Estate probably has no way of knowing whether the Sheriff had a preexisting policy without the benefit of discovery.  But some clarity is nevertheless necessary.

At this point, the only negligence theory under which the Estate could proceed without running afoul of sovereign immunity would be negligent retention/training for failure to implement an existing policy.  To the extent that Count IV contains any other theories, they are dismissed without prejudice on sovereign immunity grounds.  Under different circumstances, the Court may have been inclined to allow the Estate to replead Count IV and clarify some of the sovereign immunity issued discussed above.  But such an opportunity would do the Estate no good because any claims capable of clearing the sovereign-immunity hurdle would still be dismissed for failure to comply with Florida's presuit notice and screening requirements for medical malpractice cases.

## B.     Presuit notice and screening.

Chapter 766 of the Florida Statutes "imposes certain notice and presuit screening requirements" on plaintiffs who wish to bring "medical malpractice and medical negligence actions." J.B. v. Sacred Heart Hosp. of Pensacola, 635 So. 2d

945, 948 (Fla. 1994); see also Fla. Stat § 766.106(2)–(3).  Compliance with these

requirements is considered a condition precedent for filing a medical malpractice

action.  See Ingersoll v. Hoffman, 589 So. 2d 223, 224 (Fla. 1991).  The remedy for

failing to comply with Chapter 766 depends on the timing of the case.  If the two-

year statute of limitations for bringing a medical malpractice claim has not yet

elapsed, Florida courts may dismiss with leave to amend—that is, with leave to

properly comply (or allege that they complied) with the requirements.  See Fla. Stat.

§ 95.11(4)(b); Groover v. Polk Cnty. Bd. of Cnty. Comm'rs, 460 F. Supp. 3d 1242,

1257 (M.D. Fla. 2020) (citing S. Neurosurgical Assocs., P.A. v. Fine, 591 So. 2d 252,

255 (Fla. 4th DCA 1991)).  But if the limitations period has expired, leave to amend

would be futile.  See Johnson v. McNeil, 278 F. App'x 866, 872 (11th Cir. 2008).

Chapter 766 is limited to claims for "medical negligence" or "medical

malpractice," which are defined as claims "arising out of the rendering of, or the

failure to render, medical care services."  Fla. Stat. § 766.106(1)(a).  "[F]or a claim to

sound in medical malpractice, the act from which the claim arises must be directly

related to medical care or services, which require the use of professional judgment

or skill."  Nat'l Deaf Acad., LLC v. Townes, 242 So. 3d 303, 311 (Fla. 2018).

Moreover, section 766.110(1) imposes a duty on "[a]ll health care facilities . . . to

assure comprehensive risk management and the competence of their medical staff

and personnel through careful selection and review."  These duties include the

adoption of written procedures for staff selection, periodic review of the care

21

provided by the facility's medical staff, and the initiation of a comprehensive risk management program.  § 766.110(1)(a)–(c).

Sheriff Rambosk moves to dismiss Count IV for failure to comply with Chapter 766's presuit screening requirements.  (Doc. 13 at 14–15.)  The Estate argues that Chapter 766 does not apply to claims for negligent hiring, retention, training, and supervision.  (Doc. 20 at 13–14.)  In the Estate's view, these claims are "not borne from medical care."  (Id. at 14.)  The Court disagrees.

Multiple Florida courts have held that Chapter 766 applies to the negligence theories pleaded by the Estate unless the underlying tortious act is not directly related to medical care or services.  See, e.g., Palms W. Hosp. Ltd. P'ship v. Burns, 83 So. 3d 785, 788 (Fla. 4th DCA 2011) (negligent retention); St. Anthony's Hosp. v. Lewis, 652 So. 2d 386, 387 (Fla. 2d DCA 1995) (negligent selection and retention); Martinez v. Lifemark Hosp. of Fla., 608 So. 2d 855, 856 (Fla. 3d DCA 1992) (negligent hiring and retention); cf. Burke v. Snyder, 899 So. 2d 336, 341 (Fla. 4th DCA 2005) (en banc) (holding that Chapter 766 did not apply to negligent retention claims arising from a doctor's sexual misconduct during a medical examination).

These cases rely on: (a) section 766.110(1), which imposes an affirmative duty on all "health care facilities" to have written policies of staff selection and supervision, and (b) the Florida Supreme Court's broad definition of what constitutes "medical negligence."  See, e.g., Burns, 83 So. 3d at 787–89 (citing both the affirmative duties created in Chapter 766 and the broad meaning of "medical negligence" and "medical malpractice").

22

The parties do not cite (and the Court cannot locate) any case law applying section 766.110 to a county jail, particularly where medical services in that jail are provided by a contractor.  Nevertheless, it is clear that the Estate's claim arises out from the rendering of (or failure to render) medical services.  As the complaint alleges, Mr. Kusma passed away because Armor did not provide him with the correct insulin medication and did not provide him with timely access to emergency care as his condition worsened.  The Estate believes Mr. Kusma's death could have been avoided if Sheriff Rambosk had properly screened, trained, or supervised Armor.  In other words, the complaint is based on the idea that different medical decisions would have been made if Sheriff Rambosk had done a more thorough screening or kept a tighter leash on Armor.  The Estate's theory would necessarily require the Court to scrutinize the medical decisions Armor made and determine whether they were improper in the first place.  And that inescapable conclusion means this case is a medical negligence case, as understood by the Florida Supreme Court.  Thus, the Court finds that Count IV is susceptible to Chapter 766 presuit screening and notice requirements.  All that remains is to determine whether the Court may grant leave to amend.

Mr. Kusma died on April 11, 2019.  (Doc. 1-1.)  The statute of limitations for medical malpractice is "2 years from the time the incident giving rise to the action occurred or within 2 years from the time the incident is discovered, or should have been discovered with the exercise of due diligence."  Fla. Stat. § 95.11(4)(b).  Serving

23

a notice of intent to sue for medical malpractice on a defendant tolls the statute of limitations for ninety days "as to all potential defendants."  Fla. Stat. 766.106(4).

The Estate notes that it filed a separate lawsuit against Armor in state court and complied with Chapter 766 for purposes of that case.  (Doc. 20 at 13); see also Complaint for Damages, Macauley v. Kazvinova, No. 11-2020-CA-003472-0001-XX, (Fla. 20th Cir. Ct. Oct 30, 2020).  Assuming the Estate indeed complied with Chapter 766 in the state-court lawsuit, the last day to bring a timely and procedurally proper malpractice claim against Sheriff Rambosk would have been July 9, 2021.  There are no allegations in the instant complaint, the state-court complaint, or the Estate's response to Sheriff Rambosk's motion that suggest fraud, concealment, or an intentional misrepresentation of fact that prevented the discovery of the injury.  See § 95.11(4)(b) (creating tolling exception to the medical malpractice limitations period for fraud, concealment, and intentional misrepresentation of fact).  Accordingly, the statute of limitations has now expired, and the Court need not grant leave to amend.

## CONCLUSION

For the reasons above, it is **ORDERED**:

1.  Sheriff Rambosk's motion to dismiss (Doc. 13) is **GRANTED**.

2.  Counts I and III of the complaint (Doc. 1) are **DISMISSED WITH PREJUDICE**.

3.  Count II is **DISMISSED WITHOUT PREJUDICE**.  The Estate may file an amended complaint as to Count II **no later than November 8, 2021**.

24

4. Count IV is **DISMISSED WITHOUT PREJUDICE and without leave to amend** as discussed above on grounds of sovereign immunity and **DISMISSED WITH PREJUDICE** as discussed above for failure to comply with Chapter 766, Florida Statutes.

**ORDERED** in Fort Myers, Florida, on October 25, 2021.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE